# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

)
MARCIA A. LURENSKY,                                )
                                                   )
                      Plaintiff,                   )
                                                   )
          v.                                       )        Civil Action No. 08-1199 (ABJ)
                                                   )        **UNDER SEAL**
JON WELLINGHOFF, Chairman                          )
Federal Energy Regulatory Commission,              )
                                                   )
                      Defendant.                   )
_____)

## <u>MEMORANDUM OPINION</u>

In this action, *pro se* plaintiff Marcia A. Lurensky alleges that Jon Wellinghoff, the Chairman of the Federal Energy Regulatory Commission ("defendant" or "FERC"), violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Rehabilitation Act, 29 U.S.C. § 794(a), by discriminating against her based on her gender, religion, and disability, by retaliating against her for exercising her rights, and by subjecting her to a hostile work environment in retaliation for her protected activity. Defendant has moved for summary judgment. In response, plaintiff has catalogued a series of circumstances with which she took issue over a period of several years. But because many of her claims have not been properly exhausted, and because plaintiff has not come forward with sufficient evidence to enable a reasonable jury to conclude that she suffered adverse effects as a result of discrimination or retaliation, or that she was subjected to severe and pervasive abuse or hostility, the Court will grant FERC's motion.

## BACKGROUND

### I.     Facts

Plaintiff is a GS-15 attorney who has worked in the Office of the General Counsel at FERC since 1990.[1]  Am. Compl. [Dkt. # 34] ¶¶ 4, 11.  Plaintiff is female and Jewish.  *Id.* ¶ 9.  She alleges that she suffers from one or more ailments that render her disabled.[2]  In 2003, the section in which plaintiff had previously worked was dissolved as part of a reorganization, and she was reassigned to the Energy Projects Section in FERC's Office of the General Counsel.  Def.'s Statement of Material Facts Not in Dispute ("Def.'s SOF") [Dkt. # 82] ¶ 1; Pl.'s Resp. to Def.'s SOF ("Pl.'s SOF") [Dkt. # 94–3] ¶ 1.

#### A.     Plaintiff's request for a variable work schedule

After the reassignment, plaintiff met with her manager, Robert Christin, and others, to discuss her request to maintain the work schedule that she had enjoyed in her previous assignment. *See* Decl. of Marcia A. Lurensky [Dkt. # 94-3] ("Pl.'s Decl.") ¶ 4.  Plaintiff asked to be able to continue to work from 11:00 a.m. to 7:30 p.m., as needed, to accommodate her need to attend various medical appointments.  Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2 (admitting that the meeting was held,

---

1      Though plaintiff is an experienced attorney, and despite the fact that a *pro se* attorney "is presumed to have a knowledge of the legal system and need less protections from the court," *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 234 (D.D.C. 2007), the Court construes plaintiff's filings liberally in light of her *pro se* status.

2      Based upon an Order entered by the court originally assigned to this matter, plaintiff does not identify her medical condition in her amended complaint, and the portions of the parties' statements of undisputed material facts that relate to plaintiff's health are sealed.  Order (Apr. 20, 2009) [Dkt. # 25].

but denying that the meeting was arranged "solely" to discuss plaintiff's hours).[3]   At the meeting, plaintiff agreed to a compromise:  on days when plaintiff had a doctor's appointment and gave timely notice, she could arrive as late as 10:00 a.m. and work until 6:30 p.m.; otherwise, her hours would be 9:00 a.m. to 5:30 p.m.  Def.'s SOF  ¶ 3; Pl.'s SOF ¶ 3.

### B.    Allegations of sexual harassment and plaintiff's initial EEO complaints

The amended complaint and the underlying administrative records contain considerable information about plaintiff's strained relationship with her immediate supervisor in the Energy Projects section. On June 17, 2003, the supervisor, Jack Kendall, sent a lengthy, impassioned email to the Deputy General Counsel of FERC, Marsha Gransee, and the head of the section, Robert Christin, expressing consternation about what he described as plaintiff's repeated and "malicious . . . criticisms of everyone in the agency." Ex. 2 to Decl. of Tiffany Haigler [Dkt. # 82-10] at 11.[4] He reported:  "[i]n the last 24 hours, several people have told me that [plaintiff] is saying that I am creating a hostile work environment by making inappropriate sexual comments to her."  *Id.* Kendall denied making comments of a sexual nature to plaintiff and posited that plaintiff was accusing him because she was "annoyed with [him] (more than usual)." *Id.*[5]    According to the

---

3      Plaintiff objects to almost every one of defendant's statements of undisputed material facts, but her responses consist largely of argument about how the Court should construe or interpret the facts and digressions into irrelevant matters. Thus, few if any of plaintiff's objections serve to create a genuine issue of material fact.  To simplify matters, the Court has attempted to cite only to those facts about which the parties seem to agree.

4      The exhibits to the Haigler Declaration were submitted as one large PDF document, and do not contain Bates numbering or any other continuous numbering scheme.  For that reason, the Court cites to the page number generated by ECF.

5      The email goes on to detail two recent incidents involving Kendall and the plaintiff which were immediately followed by plaintiff's making accusations about Kendall to others within the office.  Ex. 2 to Haigler Decl. at 11-12 ("[Plaintiff] left my office on Tuesday and . . . told people that day that I habitually make improper comments of a sexual nature to her.").

version of events set forth in the Declaration plaintiff filed in this case, Kendall, "spoke of sexual matters in the workplace," she "repetitively asked him not to" discuss those matters with her in 2002 and 2003, and management failed to remedy the situation. *See* Pl.'s Decl. ¶¶ 21, 24, 25; *see also* Pl.'s Aff. to Inv. Yates, Ex. 6 to Pl.'s Opp. [Dkt. # 94-3] at 67–70 (stating that Kendall allegedly accessed dating websites at work, showed plaintiff suggestive pictures, and spoke to plaintiff about some of his sexual preferences and experiences).[6]

The day after Kendall's email, Gransee and Christin met with Kendall and plaintiff and implemented a "sexual harassment protection plan," which provided that plaintiff and Mr. Kendall would be required to have a third party present whenever they interacted in person. Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9.

Three days after that meeting, on June 21, 2003, plaintiff submitted a sworn declaration, on her own initiative. Ex. 4 to Haigler Decl. [Dkt. # 82-10] (plaintiff's declaration). The declaration averred – under penalty of perjury – that plaintiff "d[id] not have any complaint of sexual harassment by and/or about and/or relating to Jack O. Kendall," that plaintiff "never had any complaint of sexual harassment by and/or about and/or relating to Jack O. Kendall," and that plaintiff "ha[s] never been sexually harassed by Jack O. Kendall." *Id.*; *see also* Def.'s SOF ¶ 10;

---

6       For his part, Kendall complained in the email that plaintiff "seems to have endless energy to go about telling tales and talking about the 'stupidity' and 'incompetence' of *everyone* at FERC . . . I have asked her repeatedly to stop telling me her criticisms of everyone in the agency." Ex. 2 to Haigler Decl. at 12. He asked: "If I were constantly making comments that she finds offensive, why would she want to be in my office for hours on end every day that she is here?" *Id.*

Pl.'s SOF ¶ 10.[7]  On July 1, 2003, plaintiff contacted an EEO counselor and alleged that in light

of the "unique situation . . . arising from her <u>NON</u>-complaint of sexual harassment," the

implementation of the sexual harassment protection plan itself constituted gender discrimination.

Ex. 3 to Haigler Decl. [Dkt. # 82-10] (plaintiff's EEO complaint).  The EEO counselor interpreted

plaintiff's complaint as asserting a hostile work environment based on plaintiff's gender, but

plaintiff objected to that characterization and brought a second complaint – this time against the

EEO officer – for improperly "reframing [her] initial complaint" as one of hostile work

environment when it was really one of gender-based discrimination.  Def.'s SOF ¶ 12; Pl.'s SOF

¶ 12, *see also* Ex. 5 to Haigler Decl. [Dkt. # 82-10].  On August 11, 2003, plaintiff withdrew both

complaints – the initial complaint about the sexual harassment protection plan, and the complaint

about the reframing of her complaint.  Def.'s SOF ¶ 13; Pl.'s SOF ¶ 13; Ex. 7 to Haigler Decl.

[Dkt. # 82-10].

### C.      Plaintiff attempts to be reassigned to another section

Meanwhile, plaintiff was alternately trying to stay on Mr. Kendall's team, and working to

be reassigned.  On June 21, 2003, plaintiff wrote an email to Deputy General Counsel Gransee and

other managers, reiterating her position that she had no complaint against Mr. Kendall, and

pleading to be allowed to remain on his team.  Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14; Ex. 9 to Haigler

---

7      Plaintiff's declaration states, in no uncertain terms, that her supervisor did not sexually
harass her.  But in this lawsuit, plaintiff asserts that he did, and that the remedial sexual harassment
protection plan itself constituted gender discrimination.  She attempts to smooth over the
inconsistency by claiming, without any evidentiary support, that management defined sexual
harassment at the June 18, 2003 meeting as limited to "seeking sexual favors."  Pl.'s SOF ¶ 10.
But even if one ignores plaintiff's sworn categorical denial, her sexual harassment claims fail for
the reasons set forth below in section III.

Decl. [Dkt. # 82-10].[8]  But just four days later, plaintiff's position changed, and she emailed Ms. Gransee to indicate that "[i]t no longer appear[ed] viable that [plaintiff] remain in Energy Projects."  Def.'s SOF ¶ 15; Pl.'s SOF ¶ 15; Ex. 10 to Haigler Decl. [Dkt. # 82-10].  Gransee responded on July 7, 2003, and wrote:

> Earlier you had sent me an email requesting NOT to be reassigned from Energy Projects, and now this email looks like a request to be reassigned. At this point, it does not seem appropriate to reassign you to another office within OGC.

Def.'s SOF ¶ 15; Pl.'s SOF ¶ 15; Ex. 10 to Haigler Decl.

In September 2003, Gransee reported:

> I've looked into your request to be reassigned from Energy Projects. Unfortunately, we cannot offer you a reassignment to another section within OGC at this time.  I certainly wouldn't mind if you wanted to check back with me from time to time.

Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16; Ex. 11 to Haigler Decl. [Dkt. # 82-10].  Plaintiff admits that she never proposed "any specific, identifiable job" to which she requested reassignment; she only made a general request to move to another OGC office.  Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16.

**D.    Plaintiff's 2003 performance review**

On August 5, 2003, plaintiff received an evaluation of "Fully Successful" for her performance during her first nine months in the Energy Projects section (October 2002 to June 30, 2003).  Def.'s SOF ¶ 17; Pl.'s SOF ¶ 17; Ex. 12 to Haigler Decl. [Dkt. # 82-10] (the evaluation). On August 20, 2003, plaintiff contacted an EEO counselor and alleged that Kendall had retaliated against her by issuing the "Fully Successful" rating.  Def.'s SOF ¶ 23; Pl.'s SOF ¶ 23; Ex. 19 to

---

8    Plaintiff contends that many of the actions that she took, including withdrawing her complaints and sending the email begging to remain on Mr. Kendall's team, were due to her feeling "intimidated" and fearful that she would lose her job.  *See* Pl.'s SOF ¶¶ 13–15.

Haigler Decl. [Dkt. # 82-10].   She also complained that her request to be transferred had been denied.   Def.'s SOF ¶ 23; Pl.'s SOF ¶ 23; Ex. 19 to Haigler Decl.

### E.   Plaintiff's request for religious leave

On September 4, 2003, plaintiff submitted a request for religious compensatory time for the upcoming Jewish High Holidays.   Def. SOF ¶ 20; Exs. 14, 16 to Haigler Decl. [Dkt. # 82-10].[9] Both requests were approved by email the next day, subject to plaintiff's making up the time with overtime.   Ex. 15 to Haigler Decl. [Dkt. # 82-10].   Plaintiff's manager warned that any overtime must be approved in advance,   before the overtime was worked.   *Id.*   But after this instruction was issued, plaintiff worked overtime during the week of October 1, 2003 without seeking prior approval, and then asked that the overtime be applied to her leave for the Yom Kippur holiday. Def.'s SOF ¶ 20; Pl.'s SOF ¶ 20; Ex. 18 to Haigler Decl. [Dkt. # 82-10].   Plaintiff's supervisor denied credit for the overtime and explained that he could not approve overtime retroactively; plaintiff had to let her supervisor know "before, not after, [she] did the work."   Ex. 18 to Haigler Decl. at 60.   Plaintiff emailed Deputy General Counsel Gransee to question her supervisor's position, and Gransee agreed that "your supervisor must approve of your plan to work outside of regular duty hours BEFORE you can receive comp time." *Id.*; *see also* Def.'s SOF ¶¶ 21–22; Pl.'s SOF ¶¶ 21–22.   She explained that "[t]his is the rule for all compensatory and overtime work." Ex. 18 to Haigler Decl. at 60; Def.'s SOF ¶¶ 21–22; Pl.'s SOF ¶¶ 21–22.

### F.   Plaintiff's formal EEO complaint

On October 27, 2007, plaintiff submitted a formal EEO complaint which alleged gender and disability discrimination, and failure to accommodate based on disability, as well as retaliation

---

9       Plaintiff objects to this statement of material fact, because she indicates that it lacks "context," and that the "context" of her requests "[is] relevant to assessing [d]efendant's motives." Pl.'s SOF ¶ 20.   With or without the "context" to which plaintiff references, it is uncontroverted that the exhibits, plaintiff's own emails, are authentic and speak for themselves.

based on her prior EEO activity (the informal complaints withdrawn in August 2003), and a hostile

work environment.  Def.'s SOF ¶ 24; Pl.'s SOF ¶ 24; Ex. 8 to Haigler Decl. [Dkt. # 82-10] (formal

EEO complaint).  Her EEO complaint specifically challenged the "Fully Successful" performance

review, and the denial of the request for reassignment.  Ex. 8 to Haigler Decl. at 24–25.  The

complaint alleged that "[m]anagement actions were taken in retaliation for my filing

discrimination charges opposing discriminatory conduct and because of my gender and disability

(disability and failure to accommodate)."  *Id.* at 21.

Two days later, plaintiff submitted a separate "informal EEO discrimination complaint,"

in which she alleged a "hostile work environment in the Energy Projects Section . . . based on

retaliation for filing discrimination charges and opposing discrimination and because of [her]

gender, religion, and physical disability – both disability discrimination and failure to

accommodate."  Ex. 8 to Haigler Decl. at 23; Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25.  The informal

complaint also requested that the denial of religious compensatory time be incorporated into the

pending formal EEO complaint.  Ex. 8 to Haigler Decl. at 23; Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25.

On February 8, 2005, plaintiff moved to amend her EEO complaint to add a claim of retaliation

based on the agency's alleged retrieval and review of documents from her computer, and that

motion was granted.  Def.'s. SOF ¶ 27; Pl.'s SOF ¶ 27; Ex. 35 to Haigler Decl. at 113.

## II.     Procedural History

After the agency entered judgment in favor of defendant on plaintiff's formal complaint,

plaintiff filed a complaint under seal in federal court on July 14, 2008.  Compl. [Dkt. # 3].  On

February 3, 2009, defendant moved to unseal the complaint, or for an order directing plaintiff to

file a redacted version of the complaint on the public record which did not include references to

plaintiff's medical diagnoses.  Def.'s Mot. to Partially Unseal Compl. [Dkt. # 16] ("Def.'s

Unsealing Mot.").  On April 20, 2009, the district judge ordered plaintiff to file an amended

complaint that did not include any reference to her medical diagnoses.  Order (Apr. 20, 2009) [Dkt. # 25] at 1.  In light of the Court's Order, the unsealing motion was denied as moot.  *Id.* at 2.

Plaintiff filed her amended complaint on May 14, 2009.  Am. Compl. [Dkt. # 34].  The amended complaint alleges disability discrimination under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* (Count I), discrimination based on religion under Title VII (Count II), gender discrimination under Title VII (Count III), retaliation (Count IV) and hostile work environment, both under Title VII (Count V).  *Id.* ¶¶ 32–36.  Plaintiff seeks $300,000 in compensatory damages, "reinstatement of accommodations," "restoration of leave," removal of her 2003 performance evaluation, "cessation of discriminatory and retaliatory acts," and attorney's fees and costs.  *Id.* at 13 ("Relief Requested").  The parties engaged in a contentious period of discovery, which required the assistance of a Magistrate Judge.  *See* Mem. & Op. (Sept. 7, 2010) [Dkt. # 86] at 3 (denying in large part plaintiff's motion to compel the production of documents, and describing her motion as "stupefying in its prolixity and complexity").

On July 29, 2010, defendant filed a motion for summary judgment.  Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 82]; Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. (Def.'s Mem.") [Dkt. # 82].  Plaintiff opposed the motion on October 21, 2010, Pl.'s Opp. to Def.'s Mot. ("Pl.'s Opp."), and defendant replied on November 23, 2010.  Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply") [Dkt. # 99].  On July 18, 2011, the Chief Justice of the United States assigned this matter to a visiting judge for resolution.  *See* Order (July 18, 2011) [Dkt. # 105].  On January 19, 2016, the matter was re-assigned to this Court.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

The mere existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

The complaint asserts five causes of action:  disability discrimination, religious discrimination, gender discrimination, retaliation, and hostile work environment.  Am. Compl. ¶¶ 32–36.  Summary judgment will be entered in favor of defendant on every count because plaintiff failed to exhaust administrative remedies as to some of her counts and she failed to put forth sufficient evidence that would allow a reasonable jury to find in her favor on others.

**I.    Plaintiff's Rehabilitation Act claim in Count I was not exhausted on a timely basis, and it fails on the merits.**

Count I of plaintiff's amended complaint asserts that after she engaged in protected activity, "FERC commenced a pattern and practice of targeted discriminatory retaliation against

her." Am. Compl. ¶ 32.  Plaintiff also alleges that "FERC has permitted employees who are not disabled and employees with medical needs to work at home, work off-site, adjust their hours of work, and receive credit for work performed off site." *Id.*  Though it is not particularly clear, the Court understands Count I to be asserting a claim that FERC unlawfully failed to accept her proposed 11:00 a.m. arrival time after she was reassigned to the Energy Projects Section in violation of the Rehabilitation Act.[10]

The Rehabilitation Act of 1973 governs employee claims of disability discrimination against the Federal Government.  According to the D.C. Circuit, "[i]ts basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result."[11] *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993); *see* 29 U.S.C. § 791(b) (requiring federal employers to take "affirmative action" when making "hiring, placement, and advancement" decisions regarding "individuals with disabilities.").  Section 501 of the Rehabilitation Act, which prohibits disability discrimination, provides the exclusive remedy for federal employees alleging that a federal agency engaged in disability discrimination.  *Taylor*

---

10      Defendant construes plaintiff's complaint in that manner, Def.'s Mem. at 29, and plaintiff did not challenge that assumption in her opposition.  *See* Pl.'s Opp. at 10–27 (providing factual and legal support for the proposition that plaintiff is disabled within the meaning of the Rehabilitation Act).  Plaintiff's opposition also seems to assert that her request for reassignment was a request for an accommodation too – because her medical conditions are exacerbated by stress – but she provides no support for the proposition that a reassignment would have eased the stress she faced in the working environment, *see* Pl.'s Opp. at 10 n.10, nor did she advance that claim before the EEOC.

11      "Because of the similarities between the Rehabilitation Act and the [Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA")], cases interpreting either are applicable or interchangeable." *Alston v. Washington Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 81 (D.D.C. 2008), quoting *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 n.10 (D.D.C. 2002).  For that reason, the Court cites to Rehabilitation Act and ADA cases interchangeably.

*v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003); 29 U.S.C. § 791(g) (incorporating section 102 of

the ADA, 42 U.S.C. § 12112); *see also Woodruff v. Peters*, 482 F.3d 521, 527–28 (D.C. Cir. 2007).

### A.   The Rehabilitation Act claim may have been statutorily exhausted, but it was not raised on a timely basis.

#### 1.   Statutory Exhaustion

An employee must administratively exhaust claims under the Rehabilitation Act by raising

a complaint with the agency before filing a lawsuit. *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir.

2006), citing 29 U.S.C. § 794a(a)(1) (limiting judicial review "to any employee . . . aggrieved by

the final disposition of [their administrative] complaint, or by the failure to take final action on

[their administrative] complaint."). Statutory exhaustion under the Rehabilitation Act is

"jurisdictional," *id.*, citing *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004),

so failure to exhaust is grounds for dismissal of claims.

In order to exhaust administrative remedies under the Rehabilitation Act, a plaintiff must

do at least four things. First, plaintiff must file an administrative complaint. *See Spinelli*, 446 F.3d

at 162 (finding that a failure to file an administrative complaint provides a statutory bar to the

Court's jurisdiction). Second, in the complaint or the administrative proceedings that follow,

plaintiff must provide notice of her claims so that the agency can properly investigate them. *See

Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Third, the plaintiff must make a good-

faith effort to cooperate with the agency. *Koch v. White*, 744 F.3d 162, 165 (D.C. Cir. 2014), citing

*Wilson v. Peña*, 79 F.3d 154, 164 (D.C. Cir. 1996). And fourth, exhaustion must be timely – the

plaintiff must comply with all applicable deadlines, such as the 45-day counseling period

prescribed in 29 C.F.R. § 1614.105(a). *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015).

It is questionable whether plaintiff statutorily exhausted her failure to accommodate claim,

that is, whether she included this issue in her administrative complaint. *See Spinelli*, 446 F.3d at

162.  Her October 2007 formal complaint alleges that the performance evaluation and denial of reassignment were retaliatory in light of her protected activity of "filing discrimination charges opposing discriminatory conduct."  Ex. 8 to Haigler Decl. at 21.  And her complaint goes on to allege "a hostile work environment . . . based on retaliation for filing discrimination charges and opposing discrimination based on [her] gender, religion, and physical disability – both disability discrimination and failure to accommodate."  *Id.* at 3.  Thus, plaintiff's formal complaint does not seem to assert a discrete claim of failure to accommodate; it only characterizes plaintiff's request for an accommodation as a protected activity that prompted FERC's alleged retaliation.

The 2007 formal administrative complaint also explains that "these claims" – concerning the performance review and the denial of reassignment – "were set forth" in plaintiff's September 9, 2003 EEO complaint.  *Id.* at 2.  The September 9, 2003 complaint, in turn, alleges "gender discrimination; disability discrimination and failure to accommodate because of disability; retaliation for filing a gender based informal discrimination complaint."  *Id.* at 4.  This raises the question of whether plaintiff's reference to a failure to accommodate in her September 9, 2003 complaint related to the request for a change in duty hours, or some other failure to accommodate.

Plaintiff's exhibits, and the agency's decision, provide some guidance.  *See* Ex. 29 to Pl.'s Opp. [Dkt. # 94-4] at 21–22 (letter from EEO Counselor dated December 31, 2003); Decision of Hr'g [Dkt. # 107-1] ("Agency Decision").  The December 31, 2003 letter from the agency's EEO counselor explains that FERC accepted for "administrative processing and investigation, the allegation of a hostile work environment" which allegedly began at the June 18, 2003 meeting when defendant implemented the sexual harassment protection plan.  Ex. 29 to Pl.'s Opp. at 21.  The EEO counselor stated that the "investigator will be directed to investigate the circumstances leading up to the June 18, 2003 meeting, the implementation of third party process, and any other

circumstances concerning Ms. Lurensky's assertion of a hostile work environment." *Id.* The letter also summarizes the issues "previously accepted for processing:"

> [T]he investigation will now examine allegations that the agency discriminated against Ms. Lurensky on the basis of gender (female), religion (Jewish), disability . . . and retaliation "(based on 2 [sic] prior EEO complaints)" concerning (1) a "fully satisfactory" performance rating . . . (2) a denial of her request for reassignment to a position outside of the Energy Projects Section . . . (3) the agency's alleged failure to accommodate Ms. Lurensky's request for compensatory religious leave; and (4) the creation of an alleged hostile work environment commencing with the June 18, 2003 meeting and surrounding circumstances.

*Id.* The EEO officer's letter implies that the "failure to accommodate" September 9, 2003 complaint was not related to medical appointments, but instead referred to denial of religious compensatory leave for the 2003 Jewish holidays.

But putting aside what was or was not embraced in plaintiff's administrative complaint, the agency recognized in its final decision that although plaintiff's disability discrimination claims were couched in terms of a hostile work environment, "each essentially sought an accommodation for [c]omplainant's alleged disabilities, and therefore, must be considered within the framework of a reasonable accommodation request." Agency Decision at 16. It therefore appears that even though plaintiff's formal complaint asserted only hostile work environment and retaliation claims, the agency investigated and addressed plaintiff's underlying concerns about the alleged failure to accommodate her medical needs.

As the D.C. Circuit has explained, the Rehabilitation Act is limited to employees "aggrieved by the final disposition" of their administrative "complaint." *Spinelli*, 466 U.S. at 162, quoting 29 U.S.C. § 794a(a)(1). Here, plaintiff has a "final disposition" on the failure to accommodate issue, but no administrative "complaint" on that claim. An argument could be made, then, that plaintiff has failed to statutorily exhaust her administrative remedies. *See Irwin v. Dep't*

14

*of Veterans Affairs*, 498 U.S. 89, 94 (1990) (explaining that because exhaustion of administrative remedies is a necessary predicate to the government's waiver of sovereign immunity, the statutory exhaustion requirement must be "construed narrowly."). But the purpose of the exhaustion requirement is to "giv[e] the charged party notice of the claim and 'narrow[] the issues for prompt adjudication and decision.'" *Park*, 71 F.3d at 907, quoting *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1970). Because the agency clearly had notice of the claim – and went on to adjudicate it – the Court will go on to consider the timeliness of the administrative complaint.

### 2.   Timely Exhaustion

The Equal Employment Opportunity Commission "has established detailed procedures for the administrative resolution of discrimination complaints" by federal employees, "including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). Under the Rehabilitation Act, "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008). If the matter is not resolved through the counseling process, the complainant may file a formal administrative complaint. 29 C.F.R. § 1614.106(b).

The time limits in the Rehabilitation Act "function[] like statutes of limitations" and are thus "subject to equitable tolling, estoppel, and waiver." *Doak*, 798 F.3d at 1104, quoting *Bowden*, 106 F.3d at 437. Thus, the time limits are not jurisdictional, *id.*, and a failure to timely exhaust an administrative remedy can be "excused" by the Court, in an exercise of its discretion. *Koch*, 744 F.3d at 164, citing *Avocados Plus*, 370 F.3d at 1250–51. Because untimely exhaustion of the EEOC's administrative requirements in 29 C.F.R. part 1614 is an affirmative defense, defendant bears the burden of proof. *Bowden*, 106 F.3d at 437. "If the defendant meets its burden, the

plaintiff then bears the burden of pleading and proving the facts supporting equitable avoidance of the defense." *Id.*

Defendant has shown that plaintiff did not timely exhaust her failure to accommodate claim because she failed to raise it within forty-five days of the denial of her proposed 11:00 a.m. – 7:30 p.m. schedule. Def.'s Mem. at 17–19; *see* 29 C.F.R. § 1614.105(a)(1). Management at FERC met with plaintiff on May 21, 2003, and they resolved her request with an agreement that permitted her to work from 10:00 a.m. to 6:30 p.m. on days when she had a medical appointment and sought prior approval. Ex. 1 to Haigler Decl. [Dkt. # 82-10]. If she was dissatisfied with that result, plaintiff was required to raise the failure to accommodate claim with an EEO counselor no later than July 7, 2003. Even if the compromise schedule did not become final until June 12, 2003, as plaintiff alleges, *see* Am. Compl. ¶ 13, plaintiff would have been required to raise the issue by July 28, 2003.

As noted above, the record supports the conclusion that plaintiff failed to raise this issue at all. But, even if one construes plaintiff's September 9, 2003 complaint broadly to include a claim based on defendant's failure to accommodate plaintiff's request for a variable work schedule, plaintiff's complaint was still not timely filed. *See* Ex. 8 to Haigler Decl. (Sept. 9, 2003 EEO complaint). Plaintiff's EEO complaints of July 1, 2003 and July 17, 2003 both raised issues of gender discrimination, but neither even mentioned plaintiff's disability, let alone the issue of defendant's alleged failure to accommodate those disabilities. In plaintiff's July 1, 2003 complaint, she alleges quite clearly that she "has been harmed by actions of management *based on gender.*" *See* Ex. 3 to Haigler Decl. at 15 (emphasis added). In her two July 17 complaints, she again reiterated that "the actions of management" to impose the sexual harassment protection plan and reframe her complaint as a hostile work environment claim "are premised on [plaintiff's]

*gender . . . .*" Ex. 5 to Haigler Decl.; Ex. 6 to Haigler Decl. [Dkt. # 82-10] (emphasis added). On August 11, when plaintiff withdrew the July 1 and July 17, 2003 complaints, she again failed to mention any failure to accommodate claim, but predicted that "in all likelihood . . . [she] will be seeking counseling regarding [her 2003 performance] Evaluation." Ex. 7 to Haigler Decl.

Thus, plaintiff does not point to grounds to dispute that she failed to timely exhaust her failure to accommodate claim. *See* Pl.'s Opp. at 4 n.2. Plaintiff's only response to defendant's timeliness argument is that it "ignores the course of defendant's conduct that is the context of defendant's actions about which plaintiff complains." *Id.* Plaintiff submitted a lengthy declaration in opposition to the motion for summary judgment, but she does not aver that she spoke to an EEO officer about her change in duty hours in a timely manner, or that any factors warrant a tolling of the timing requirement. Plaintiff has therefore not met her burden of "pleading and proving the facts supporting equitable avoidance of the defense."[12] *Bowden*, 106 F.3d at 437.

**B.    Even if plaintiff had exhausted her administrative remedies, the agency's accommodation of plaintiff's disabilities was reasonable.**[13]

Even if plaintiff had properly exhausted her administrative remedies on her failure to accommodate claim, Count I also fails on the merits because defendant offered plaintiff an adequate and reasonable accommodation for her disabilities.

As the D.C. Circuit has explained:

> To withstand summary judgment on her accommodation claims, [plaintiff] had to come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable

---

12    Plaintiff may have been able to successfully argue that defendant waived its timeliness defense by not raising it during the administrative process. *See Bowden*, 106 F.3d at 169–70. But she bears the burden of raising this issue, and she failed to do so.

13    The Court will redact any discussion of plaintiff's specific medical condition in this subsection of the opinion.

accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability.

*Doak*, 798 F.3d at 1105. The only elements in serious dispute in this case are whether (i) plaintiff was disabled under the Rehabilitation Act, and (iv) whether defendant's proposed schedule to accommodate plaintiff's disabilities was reasonable.

In her opposition to the motion for summary judgment, plaintiff took the position that her medical conditions – which she asserts are exacerbated by stress – were not accommodated when her request for reassignment was denied. Pl.'s Opp. at 10 n.10 (noting conclusorily that despite plaintiff's "repetitively" asserting that "her impairments are exacerbated by stress, defendant refused to reassign her."). So before the Court can consider whether defendant failed to accommodate a disability, it must first make clear which allegation – the refusal to change plaintiff's duty hours, or the denial of her request for reassignment – is actually at the heart of Count I.

The Court starts with plaintiff's complaint itself, which explains that her disability discrimination count is premised on the allegation that "FERC has permitted employees who are not disabled . . . to work at home, work off-site, adjust their hours of work, and receive credit for work performed off site." Am. Compl. ¶ 32. Thus, the cause of action in plaintiff's amended complaint is based on the denial of plaintiff's proposed alternative work schedule, and it makes no reference to the denial of reassignment.

Moreover, it is clear from plaintiff's own statements at the time that any failure to accommodate allegations relate to the possible change in her work hours, and not a request for reassignment to eliminate stress. Plaintiff's June 21, 2003 email to management could not be more clear. Plaintiff wrote: "I never requested reassignment from Energy Projects;" "I have been reassigned during three (3) reorganizations at the Commission. I do not want to be subjected to

another reassignment;" "I do not want to be reassigned from Energy Projects;" and "Management will create an aura of suspicion and an impossible work environment for me in the Commission if I am unilaterally reassigned." Ex. 9 to Haigler Decl.  Plaintiff's email to Deputy General Counsel Gransee four days later begins with the subject line, "I would appreciate efforts to mitigate ongoing harm," and it goes on to ask to speak about "appropriate remedies." Ex. 10 to Haigler Decl.

Management interpreted the vague statement "it no longer appears viable that I remain in Energy Projects," *id.*, to be a vague request for a transfer, but nowhere in plaintiff's emails to her managers does she assert that she is asking to be reassigned because of the stress in her current position that exacerbated her disabilities.  Plaintiff's statements make clear that she was asking to be reassigned (or not) because of the awkward position in which she found herself after the sexual harassment protection plan was initiated, and for no other reason.  And there is no support in the record to prove that plaintiff requested a reassignment as an accommodation for her disabilities. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied.")  So the Rehabilitation Act claim can only be predicated on plaintiff's request for a variable work schedule, and it turns upon (1) whether plaintiff has a disability under the Rehabilitation Act, and (2) whether the agency's accommodation of a 10:00 a.m. start time was reasonable.

      **1.**     **The Court assumes without finding that plaintiff has a disability for purposes of the Rehabilitation Act**

The Rehabilitation Act relies upon the ADA's definition of an "individual with a disability." *See* 29 U.S.C.§ 705(20)(B), citing 42 U.S.C. § 12102.  Under the ADA, an individual with a disability is an individual who has "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or [is] regarded

as having such an impairment."  42 U.S.C. § 12102.  Plaintiff conclusorily claims that she qualifies

for protection under the Rehabilitation Act under each of those definitions, but the parties' briefing

only addresses the "substantially limits" prong.  *See* Pl.'s Opp. at 12–27; *see also* Def.'s Mem. at

23–32.

Plaintiff has catalogued a host of physical impairments which she claims substantially limit

the life activities of walking and sexual activity.  Plaintiff spends more than fifteen pages of her

brief describing her medical condition in excruciating detail, explaining how those conditions

substantially affect her life.  *See* Pl.'s Opp. at 11–27.  Plaintiff also devotes a portion of her

pleading impugning the integrity of the government attorneys who sought summary judgment on

the claim.  *Id.*  Putting aside the vitriol that had no place in plaintiff's pleadings, it is clear that

plaintiff does suffer from a number of serious and uncomfortable conditions that no one would

volunteer to endure.  But the question before the Court is whether this evidence supports the

necessary findings under the Rehabilitation Act.

Plaintiff's primary medical ailment is psoriasis, a skin condition which is "debilitating

[and] painful."  Pl.'s Decl. ¶ 2.  According to plaintiff, her condition causes her skin to be "fragile,

subject to bleeding, subject [to] infection, does not protect [her] body from infection, is painful,

and causes [her] embarrassment."  *Id.*  She states that due to her medical condition, she has, over

the course of her life, "attempted to engage in sexual activity ten times or less," and has not

engaged in sexual activity since 1989.  *Id.*

Plaintiff's treatment for psoriasis has been ongoing since about 1972.  *Id.* ¶ 9.  She currently

manages the condition with regular visits to the doctor, and with a complicated skin treatment

program, which includes "soaking in oil, applying skin lubricant, [and] wrapping in plastic wrap

. . . at night, prior to sleeping."  *Id.*  She also receives "an intravenous infusion . . . approximately

every three (3) weeks." *Id.* at ¶ 11.  Plaintiff also suffers from psoriatic arthritis, which "causes

painful swelling and stiffness in the joints." *Id.* at ¶ 2.

In December 1996, plaintiff suffered a stroke, and was on extended leave from FERC from

December 1996 to January 1999.  *Id.* ¶ 6.   And, plaintiff suffers from cardiomyopathy and

congestive heart failure.  *Id.* ¶ 7.[14]

While defendant disputes plaintiff's characterization of the degree of her limitations, it

does not differ with her recitation of her various diagnoses.  Therefore, the Court will proceed on

the assumption that plaintiff's conditions constitute disabilities which substantially limit the life

activity of walking and sexual activity.  In the end, no holding on that issue is required, because

the more pertinent question is whether the requested accommodation – an as-needed daily start

time of 11:00 a.m. – was necessary, or whether the agency's accommodation – arrival at 10:00

a.m. in mornings with medical appointments – would suffice.  And plaintiff's opposition does not

contain even one sentence challenging defendant's contention that her 10:00 a.m. plan was

reasonable.

### 2.        Defendant provided a reasonable accommodation.

Assuming that plaintiff can show that she has a disability under the Rehabilitation Act, she

cannot show that a daily work schedule of 11:00 a.m. to 7:30 p.m. was necessary to address any

of her medical conditions.  As the D.C. Circuit has recognized, an employer is "not required to

provide an employee that accommodation he requests or prefers; the employer need only provide

some reasonable accommodation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir.

---

14     Plaintiff's declaration asserts that her disabilities also include "seizure-like episodes from
fluorescent/non-incandescent light," autoimmune disorders, and other conditions.  Pl.'s Decl. ¶ 7.
But because plaintiff's formal complaint of disability discrimination was limited to her claims
related to psoriasis, stroke, and her heart conditions, those are the only conditions relevant to the
resolution of her claims in this case.

1998), quoting *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996).  And, more crucially, "there must be some causal connection between the major life activity that is limited and the accommodation sought."  *Desmond v. Mukasey*, 530 F.3d 944, 959 (D.C. Cir. 2008), quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007).

By remaining silent on the issue, plaintiff has conceded that there is no causal connection between the major life activities that she claims have been limited by her disabilities – walking and sexual activity – and arriving to work at 11:00 a.m., instead of 10:00.  *See FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997) (where a party does not address arguments advanced by her opponent, the Court may treat those arguments as conceded).  And there is certainly no evidence in the record showing that an extra hour in the morning would improve plaintiff's ability to engage in the life activities of walking or sexual activity.

It is an undisputed fact that plaintiff took public transportation – the Metro – to work every day, from her home in Van Ness to her office near Union Station.  *See* Pl.'s Decl. ¶ 10 (admitting that she took a Metrorail train to and from work, five days per week).  And she asserts that when she rode Metro, she "needed to be seated."  Pl.'s Decl. ¶ 10.  But plaintiff has put forth no evidence that would create a genuine issue of material fact on the question of whether the requested accommodation bore any causal connection to her walking limitations.  And of course, the time the work day was to begin bears no causal connection to the limitations on plaintiff's sexual activity, especially given plaintiff's representation that she has not engaged in that activity since 1989.  *See* Pl.'s Decl. ¶ 2.

Therefore, because plaintiff cannot show that there is any "causal connection between the major life activity that is limited and the accommodation sought,"  *Desmond*, 530 F.3d at 959,

quoting *Squibb*, 497 F.3d at 785, her claim of disability discrimination based on failure to accommodate fails on the merits.

For those reasons, the Court will grant summary judgment to defendant on Count I.

## II.    Plaintiff was not discriminated against on the basis of her religion, so Count II fails.

In Count II, plaintiff claims that she was "not credited for hours worked and work performed for accrual of religious compensatory time," and that the agency's "positions and conditions for accrual of religious compensatory time" were "varying." Am. Compl. ¶ 33. She contends that "[b]ut for being Jewish[,] [p]laintiff would not have needed to be absent from the work site for the Jewish High Holy Days," and that the actions of management "in failing to credit [p]laintiff for time worked toward accrual of religious compensatory time constituted retaliation and discrimination based on [p]laintiff's religion." *Id.*

Under Title VII, an employer is required to "accommodate" an employee's religious observance unless the accommodation would cause "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). An employer need not accommodate an employee at all costs, *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986), nor does Title VII require employers to accommodate religious observance in a way that spares employees of any costs. *Pinsker v. Joint Dist. Number 28J*, 735 F.2d 388, 390–91 (10th Cir. 1984). An employer must make only those accommodations that are "reasonable." *Ansonia Bd. of Educ.*, 479 U.S. at 68.

The plaintiff in *Ansonia*, Richard Philbrook, was a high school teacher. *Id.* at 62. His religious beliefs required him to miss approximately six school days each year. *Id.* at 63. The school's collective bargaining agreement with the teacher's union granted teachers three days of paid religious leave, which was not charged against the teacher's annual or accumulated leave. *Id.* at 63–64. But the school also forbade its teachers from using any remaining personal time for religious observance. *Id.* Philbrook requested that he be allowed to "pay the cost of a substitute

and receive full pay for additional days off for religious observance," but the school consistently denied his request.  *Id.* at 65.  Philbrook sued, arguing that the prohibition on the use of additional personal time for religious observance violated Title VII.  *Id.* at 65.

The Supreme Court found "no basis in either the statute or the legislative history for requiring an employer to choose any particular reasonable accommodation."  *Id.* at 68.  Because the employer needs only to "reasonably accommodate[] the employee's religious needs," when its actions are reasonable, "the statutory inquiry is at its end," and the "employer need not further show that each of the employee's alternative accommodations would result in undue hardship."  *Id.*

The Supreme Court ultimately sided with the school, and held that a policy which allowed leave without pay for religious observance is a reasonable accommodation for religious observance.  *Id.* at 70.  The Court reasoned that "[t]he provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work."  *Id.*  The Court cautioned, however, that the use of paid leave "may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all."  *Id.* at 71, quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984).

Although the Court in *Ansonia* declined to articulate a framework for an employee's claim of failure to accommodate religious beliefs, other circuits require that a plaintiff must make a *prima facie* showing that "(1) he held a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employers of this belief; and (3) he was discharged for failure to comply with the conflicting employment requirement."  *See, e.g.*, *Daniels v. City of Arlington*, 246 F.3d 500, 506 (5th Cir. 2001); *see also Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76,

95 (D.D.C. 2006) (citing cases from the Second, Third, Fourth, Fifth, and Eighth Circuits); *Taub v. FDIC*, No. 96-5139, 1997 WL 195521, at *1 (D.C. Cir. Mar. 31, 1997) (citing, but not officially adopting, this test).  Once plaintiff establishes a *prima facie* case, "the burden shift[s] to the employer to show that it was unable reasonably to accommodate [the plaintiff's] religious needs without undue hardship."  *Daniels*, 246 F.3d at 506.

Plaintiff cannot meet her *prima facie* burden, because she was not discharged for taking paid religious leave.  She has not alleged that her position was jeopardized in any way by virtue of her religious observance, nor has she shown that defendant applied its leave policy in a discriminatory fashion.

Plaintiff faults defendant for refusing to allow her to use the overtime hours that she chose to work in advance of the holiday without seeking approval to cover her request for religious leave.  Pl.'s Opp. at 27–28.  FERC's policy required plaintiff to request *paid* time off in advance of religious leave, and required her to make up the time after the leave was taken by working pre-approved overtime.  This policy is clearly reasonable under Title VII, especially in light of the Supreme Court's holding in *Ansonia* that even *unpaid* religious leave would be a reasonable accommodation for religious observance.

Neither of plaintiff's arguments establish that defendant's policy imposed an undue burden.  Plaintiff argues first that the "temporal proximity between her protected activities" and the denial of her request to use previously-worked overtime to cover her upcoming religious leave shows "targeted religious discrimination."  Pl.'s Opp. at 27.  But even if there was a temporal proximity, plaintiff has not shown that management's actions, which simply applied an existing, neutral policy, were in any way motivated by religious or retaliatory animus.

25

Second, plaintiff focuses on defendant's statement in prior proceedings in this case that requests for religious compensatory time were handled "informally." *Id.* at 28.  She argues that the admitted informality "bolsters [p]laintiff's contentions about the discriminatory manner in which matters related to her religious compensatory time were addressed by the Agency . . . ." *Id.* at 28.  Apparently, in responding to plaintiff's request during discovery for "*all* documents related to granting or denying religious compensatory time in the Office of General Counsel without any time limitation whatsoever,"  Mem. Op. (Sept. 7, 2010) [Dkt. # 86] at 20, defendant told the Magistrate Judge that the request would be unduly burdensome:  "as [p]laintiff's own requests for religious compensation time demonstrate, these requests are often handled informally and therefore such documents are often not readily accessible from personnel files."  Def.'s Opp. to Pl.'s 2d Mot. to Compel Production of Documents [Dkt. # 58] at 37 n.18.  The Magistrate Judge relied on this representation in denying the request, but neither flexibility or informality, nor the absence of a paper trail, constitute proof of a discriminatory purpose in this case.

For those reasons, the Court will grant summary judgment to defendant on Count II.

## III.   Plaintiff's gender discrimination claim in Count III fails because plaintiff likely failed to exhaust it, and because it fails on the merits.

In Count III, plaintiff claims that FERC discriminated against her based on gender when her supervisor, Mr. Kendall, allegedly sexually harassed her.  Her complaint alleges that "[b]ut for [plaintiff] being female[,] Managing Attorney Jack O. Kendall would not have spoken to her as he did about sexual matters, or continued to do so, nor would Mr. Kendall have made the comments and harassment allegations that he did against [p]laintiff."  Am. Compl. ¶ 34.

Congress enacted Title VII of the Civil Rights Act of 1964 to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013).  The anti-discrimination provision "makes it unlawful for

an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's'" race, religion, sex or other protected characteristics.  *Steele*, 535 F.3d at 695, quoting 42 U.S.C. § 2000e–2(a).  To state a claim under Title VII's anti-discrimination provision, plaintiff must establish two elements:  that "(i) the plaintiff suffered an adverse employment action (ii) because of [her] race, color, religion, sex, national origin, age*,* or disability."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Not every action by an employer against an employee qualifies as an "adverse employment action" that is protected by Title VII.  *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").  An actionable adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  To ultimately establish an adverse employment action, a plaintiff must show that she "experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio*, 306 F.3d at 1131.  Plaintiff must show "direct economic harm," *Ellerth*, 524 U.S. at 762, affecting, for instance, an employee's grade or salary.  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).

Title VII claims may be proved by direct or circumstantial evidence.  "Direct evidence of discriminatory intent alone is sufficient to survive summary judgment."  *Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 216 (D.C. Cir. 2014), citing *Stone v. Landis Constr. Corp*, 442 F. App'x 568, 569 (D.C. Cir. 2011).  So, a statement that itself shows bias in the adverse decision is direct

evidence that would generally entitle a plaintiff to a jury trial.  *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014); *Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).  "While courts have not precisely defined what constitutes direct evidence, it is clear that at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself."  *Hajjar-Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014).

In the absence of direct evidence that defendant discriminated against plaintiff due to her gender, plaintiff must prove her claim through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The framework establishes an "allocation of the burden of production and an order for the presentation of proof" in Title VII cases. *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1149 (D.C. Cir. 2004), quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

"*McDonnell Douglas* identified the paradigmatic elements of a prima facie case in a Title VII case involving a failure to hire," but the D.C. Circuit has since explained that the same test can be used in any Title VII case.  *Id.* at 1149–1150.  To prove a prima facie claim under *McDonnell Douglas*, a plaintiff must show that  "(1) she is a member of the protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Id.* at 1150, quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).

If a plaintiff can prove a prima facie case, she "creates a rebuttable 'presumption that the employer unlawfully discriminated against' [her]."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983), quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Then, the employer must produce evidence to establish that its action was motivated by a legitimate, nondiscriminatory reason.  *Burdine*, 450 U.S. at 254–56.

### A.      Plaintiff failed to exhaust her sexual harassment claim

As was the case under the Rehabilitation Act, before a federal employee may file suit under Title VII, she must seek "administrative adjudication of her claim." *Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010), citing *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005).  "Title VII '[c]omplainants must timely exhaust the[ir] administrative remedies before bringing their claims to court.'" *Id.* at 65, quoting *Bowden*, 106 F.3d at 437.  Title VII requires that before commencing a suit in federal court, a plaintiff must present a claim in an administrative complaint and allow the agency time to act on the complaint.  *See generally* 42 U.S.C. § 2000e–16; 29 C.F.R. § 1614.106(a) (requiring complainant to file formal complaint within 180 days of alleged discriminatory event).

"These procedural requirements governing [a] plaintiff's right to bring a Title VII claim in federal court are not trivial." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 68 (D.D.C. 2007).  "Because timely exhaustion of administrative remedies is a prerequisite to a Title VII action against the federal government," a court may not consider a discrimination claim that has not been exhausted.  *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003).

Count III of plaintiff's complaint alleges that

> Because [p]laintiff is female the sexual harassment issue was raised by FERC in regard to Mr. Kendall and [p]laintiff.  But for Marcia Lurensky being female Managing Attorney Jack O. Kendall would not have spoken to her as he did about sexual matters, or continued to do so, nor would Mr. Kendall have made the comments and harassment allegations that he did against [p]laintiff.

Am. Compl. ¶ 34.  Granting plaintiff the benefit of every inference, the complaint alleges both that the sexual harassment protection plan implemented by FERC constituted gender-based discrimination, and that Kendall sexually harassed her.

Prior to the filing of this action, though, plaintiff had been clear in her position that Mr. Kendall never sexually harassed her.  During the administrative process, plaintiff filed a

declaration swearing that she "d[id] not have any complaint of sexual harassment by and/or about and/or relating to Jack O. Kendall," that she "never had any complaint of sexual harassment by and/or about and/or relating to Jack O. Kendall," and that she "ha[s] never been sexually harassed by Jack O. Kendall."  Ex. 4 to Haigler Decl. [Dkt. # 82-10]; *see also* Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10.  Plaintiff's initial complaint of July 1, 2003, alleged that in light of the "unique situation" "arising from her *non-complaint of sexual harassment*," the imposition of sexual harassment protection plan itself constituted gender discrimination.  Ex. 3 to Haigler Decl. (plaintiff's EEO complaint) (emphasis added).  So that much was presented to the agency.  But plaintiff withdrew even that administrative allegation.  Def.'s SOF ¶ 13; Pl.'s SOF ¶ 13; Ex. 7 to Haigler Decl. [Dkt. # 82-10].  Because plaintiff specifically disavowed any claim of sexual harassment on the part of her supervisor, and withdrew the claim of gender discrimination based on the plan, including it only in her formal complaint as one of the discrete acts underlying her retaliatory hostile work environment claim, *see* Ex. 8 to Haigler Decl. at 24–25, she has failed to exhaust administrative remedies on either aspect of her gender discrimination claim.  Therefore, to the extent that plaintiff's claim in Count II is premised on Title VII's anti-discrimination provision, it fails because it was not exhausted.

  **B.**  **Plaintiff's allegations regarding her supervisor do not prove that she was subjected to a hostile work environment based on sexual harassment.**

  Even if plaintiff had exhausted her administrative remedies, plaintiff would not succeed on the merits.  Title VII provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be free from any discrimination based on . . . sex."  42 U.S.C. § 2000e–16(a).  One form of discrimination is sexual harassment, which can include not only unwelcome sexual advances, but also other verbal conduct of a sexual nature that creates a hostile work environment.  Title VII "makes it unlawful for a supervisor in a covered federal agency to create a hostile

environment based upon an employee's sex." *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009).  But sexual harassment creates a hostile environment only if it is so "severe or pervasive [as] to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  To survive summary judgment, a plaintiff asserting a sexual harassment hostile work environment claim, like all hostile work environment claims, must demonstrate that a reasonable jury could find the sexual harassment to be severe or pervasive.  *Ellerth*, 524 U.S. at 752.  Plaintiff has not satisfied that burden.

The only evidence of sexual harassment that plaintiff has provided is her self-serving declaration that her supervisor, Mr. Kendall, "spoke of sexual matters in the workplace," that plaintiff "repetitively asked him not to" discuss those matters with her in 2002 and 2003, and that until the June 18, 2003 meeting, management failed to remedy the situation.  *See* Pl.'s Decl. ¶¶ 21 24, 25; Ex. 6 to Pl.'s Opp. at 67–70.  Plaintiff does not allege that the supervisor made any advances towards her – only that his discussion of his own sexual preferences constituted gender-based offensive conduct directed at her.

There is a genuine dispute as to whether the alleged offensive conduct took place.  But even if it did, the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), quoting *Meritor*, 477 U.S. at 67.  So even if plaintiff felt that her supervisor's comments were inappropriate, the mere fact that these comments were sexual in nature does not mean that they are actionable.  Rather, plaintiff must establish that the sexual harassment was severe and pervasive, *Ellerth*, 524 U.S. at 752, which she has failed to do.

The comments that plaintiff describes do not rise to the demanding legal standard for a hostile work environment.  *See Forklift Sys.*, 510 U.S. at 21–23; *see also Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77 (D.D.C. 2013) ("In our circuit, even multiple instances of physical contact and sexual advances may not be sufficient" to prove a hostile work environment); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–98 (D.D.C. 2007) (holding that five discrete inappropriate acts over a two-year period as well as "infrequent inappropriate comments and staring," was not severe and pervasive); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (three isolated incidents – where a co-worker caressed plaintiff's knee, placed her breast on his arm, and placed her fingers on his buttocks – were not "sufficiently severe in quantity or quality" to create a hostile work environment).

A review of some of the cases in this district that have found a hostile work environment also demonstrates by contrast that the comments plaintiff claims were made do not approach the necessary severity or pervasiveness needed to survive summary judgment.  *Simms v. Ctr. for Corr. Health & Policy Studies*, 794 F. Supp. 2d 173, 193 (D.D.C. 2011) (reasonable jury could find hostile work environment where co-worker asked out plaintiff every time he saw her, harassed her daily for two years by commenting on her appearance, asked to see her body, stared at her, undressed her with his eyes, and physically accosted her at work); *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 346 (D.D.C. 2011) (jury could find hostile work environment where co-worker made inappropriate comments which intensified over time, and "began a course of physical intimidation and contact with [plaintiff] that included attempts to kiss her, uninvited visits to her office, solicitations for sex, grabbing and pinching of her breast, and grabbing and spanking of her behind").

It may well be that plaintiff considered Kendall's behavior to be offensive and inappropriate – notwithstanding her disavowal of any claim against him in her sworn affidavit – but the isolated conversations were not sufficiently severe or pervasive as to alter the conditions of her employment.  *See Ellerth*, 524 U.S. at 742.[15]  Therefore, even if plaintiff has accurately described the offending conversations, and even if she had preserved the claim, she has not come forward with sufficient evidence to establish the existence of a hostile work environment.

### C.  The sexual harassment protection plan was not an adverse employment action

Plaintiff's alternative claim – that the sexual harassment plan that was implemented to shield her from unpleasant interactions with her supervisor constitutes gender-based discrimination – fares no better.  That claim, like her religious discrimination claim, is governed by the *McDonnell Douglas* framework.  Plaintiff must show:  (i) that she suffered an adverse employment action; and (ii) that the action was based upon her gender.  *Baloch*, 550 F.3d at 1196.

Plaintiff cannot show that the sexual harassment protection plan, put in place as an interim solution while the agency investigated the accusations that were disrupting the Energy Projects Section, was an adverse employment action.  Plaintiff's only argument in response to the government's motion for summary judgment on Count III on these grounds is that "[t]he context of defendant's actions, and his defense . . . buttress plaintiff's complaints of targeted discrimination and retaliation."  Pl.'s Opp. at 28.  But the law requires more than "context;" it requires a "significant change in employment status," *Ellerth*, 524 U.S. at 761, and "tangible harm." *Forkkio*, 306 F.3d at 1131.  Plaintiff has alleged neither, and there is no evidence in the record to support a finding on either of those elements.  The sexual harassment protection plan may have been

---

15    Plaintiff's complaint contains a conclusory assertion that "but for" her gender, Kendall would not have spoken to her about sexual matters, Am. Compl. ¶ 34, but there is no basis in the record for that conclusion.

annoying, and it may have limited plaintiff's ability to seek her supervisor's guidance on her work at any time, but because "not everything that makes an employee unhappy is an actionable adverse action," *Principi*, 257 F.3d at 818, the Court finds that plaintiff's gender discrimination claim based on the sexual harassment protection plan cannot survive summary judgment.[16]

In sum, because plaintiff did not administratively exhausted her sexual harassment claims, and because they would fail on the merits, the Court will grant summary judgment to defendant on Count III.

## IV.   There are exhaustion problems with the retaliation claims in Count IV and they fail on the merits.

Count IV of plaintiff's complaint asserts that FERC violated the anti-retaliation provision of Title VII.   Am. Compl. ¶ 35.   That provision makes it unlawful for "an employer [to] 'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 52, 56 (2006), quoting 42 U.S.C. § 2000e–3(a); *see also Steele*, 535 F.3d at 695.   Claims for retaliation based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).   To make out a *prima facie* case of

---

16      Even if plaintiff could prove a prima facie case, defendant would likely be protected by an affirmative defense.   An employer has an affirmative defense to a hostile environment sexual harassment claim if:   "(1) [T]he employer 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Taylor*, 571 F.3d at 1318, quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Ellerth*, 524 U.S. at 742.   The decision to put the sexual harassment protection plan in place tends to show that defendant took reasonable care to protect the plaintiff from the alleged offensive behavior.   And plaintiff's efforts after the plan took effect – to "withdraw" the complaints, and to send numerous emails to agency management to try to undo the protection plan, could constitute an unreasonable failure to take advantage of the protection plan. Under those circumstances, plaintiff's gender discrimination claim would fail.

retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal connection connects the two." *Id.*, citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

Defendant asserts that he is entitled to judgment on Count IV because plaintiff has failed to exhaust many of the alleged acts of retaliation, and the ones that remain should be dismissed because they either do not constitute adverse actions under Title VII or because plaintiff cannot rebut the legitimate non-discriminatory reasons for them.  Def.'s Mem. at 37.

Plaintiff's complaint includes a list of retaliatory acts that defendant allegedly took after plaintiff engaged in protected activity:

- Monitoring plaintiff's computer;

- Revoking plaintiff's accommodations;

- Instructing plaintiff to remove a sign from her office door;

- Changing plaintiff's duty hours;

- Failing to credit plaintiff for hours worked for the accrual of religious compensatory time;

- Failing to grant plaintiff administrative leave for protected activity, and charging annual leave for protected activity;

- Denying plaintiff's requests for reassignment;

- Giving plaintiff a "Fully Successful" performance evaluation in 2003 and 2004; and

- Targeting plaintiff during the agency's investigation.

Am. Compl. ¶ 35.  The Court will begin with an analysis of the administrative exhaustion question, and it finds that plaintiff failed to exhaust many of her retaliation claims.  And, the claims that were exhausted fail on the merits.

### A.  Plaintiff likely failed to administratively exhaust her retaliation claims.

Defendant argues that plaintiff failed to exhaust administrative remedies on many of her retaliation claims.  Def.'s Mem. at 36–37.  In response, plaintiff states that defendant's retaliatory conduct began when she was transferred to the Energy Protects section, and "was ongoing."  Pl.'s Opp. at 29 n.15.  The Court construes this argument as an attempt to claim a continuing violation under *Park v. Howard University*, 71 F.3d 904 (D.C. Cir. 1995), but it is unclear whether that doctrine has survived the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002), and plaintiff's allegations do not meet the *Park* standard in any event.

Title VII requires a plaintiff who complains of unlawful discrimination to exhaust her administrative remedies before bringing a lawsuit.  42 U.S.C. § 2000e-16(c); *see also Park*, 71 F.3d at 907 ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge.").  Thus, generally speaking, a lawsuit that flows from an EEOC charge is limited to the claims made in the charge.

But the question of whether under some circumstances, a plaintiff could bring unexhausted claims of retaliation that relate to earlier-filed, administratively exhausted claims has remained unsettled in this Circuit.  *See Payne*, 619 F.3d at 65 (declining to clarify this issue).  In 1995, the D.C. Circuit held that "[a] Title VII lawsuit following [an] EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations,'" *Park*, 71 F.3d at 907, quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994), and that also would "arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  *Id.*, quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981).  Then, in 2002, the Supreme Court examined the statutory time limits for the initial administrative filing of a Title VII charge and held that "discrete discriminatory

acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

Some courts in this district have concluded that *Morgan* overruled the *Park* "like or reasonably related" rule, and that every discrete claim of retaliation must be administratively exhausted. *See, e.g.*, *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005). Other courts have found that *Morgan* did not overrule *Park*, and that a plaintiff may still bring unexhausted claims of retaliation when the claims are "of a like kind to the retaliatory acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature." *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 136–38 (D.D.C. 2009), citing *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir. 2006). The D.C. Circuit has not yet clarified which standard applies. *See Payne*, 619 F.3d at 65 (declining to reach the question of whether *Morgan* overruled the "of a like kind" rule, where the respondent's claims were unsustainable under either standard); *see also Mount v. Johnson*, 36 F. Supp. 3d 74, 84–86 (D.D.C. 2014) (discussing the differing interpretations of *Morgan* and collecting cases).

For present purposes, however, the Court need not decide which standard applies because plaintiff's non-selection and personal disclosure claims do not survive under either test. *See Payne*, 619 F.3d at 65; *see also Mount*, 36 F. Supp. 3d at 86 (declining to decide whether *Morgan* overruled *Park*, where the claims could be dismissed under the *Park* standard); *Coleman v. Johnson*, 19 F. Supp. 3d 126, 137 (D.D.C. 2014) (same result).

Only three of plaintiff's alleged retaliatory acts were raised in plaintiff's complaints before the agency:   the September 2003 denial of plaintiff's request for reassignment, the 2003 performance evaluation, and the alleged refusal to credit the overtime worked in October 2003 as religious compensatory leave. *See* Ex. 35 to Haigler Decl. at 113. Plaintiff later added a claim of

retaliation based on the documents that plaintiff claimed were improperly retrieved from her government computer. *Id.*[17]

The Supreme Court's opinion in *Morgan* points to a finding that plaintiff failed to exhaust administrative remedies on all of the other acts of alleged retaliation: the alleged revocation of plaintiff's accommodations for her disabilities; the demand that plaintiff remove a sign from her office door; the changing of plaintiff's duty hours; the failure to grant administrative leave for protected activity; and the "targeting" of plaintiff during the agency's internal investigation. *See* Am. Compl. ¶ 35. Even if the *Park* test is still applicable in this Circuit, none of these incidents is "of a like kind" to those described in the administrative complaints, and therefore, they were not exhausted. *See Payne*, 619 F.3d at 65; *see also Mount*, 36 F. Supp. 3d at 86; *Coleman*, 19 F. Supp. 3d at 137.

> **B.    The Court will grant summary judgment to defendant on the remainder of plaintiff's claims of retaliation, because none of those claims is actionable.**

The standard for what constitutes an adverse action under Title VII's anti-retaliation provision is different than what constitutes an adverse action under the anti-discrimination provision. *Burlington N.*, 548 U.S. at 57; *Steele*, 535 F.3d at 695–96. The "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harms," *Burlington N.*, 548 U.S. at 67, and therefore, it does not require a materially adverse change in the terms and conditions of employment. *Steele*, 535 F.3d at 695–96; *see also*

---

17    On July 30, 2004, plaintiff moved to amend her formal EEO complaint to add a number of additional retaliatory claims that had been presented to the agency, including the removal of the sign from her office door, her 2004 performance evaluation, and failure to grant administrative leave for work so that plaintiff could work on her EEO complaint at the office. Ex. 23 to Haigler Decl. [Dkt. # 82-10] at 76–78. The Administrative Judge denied plaintiff's motion to amend her complaint because the new allegations "do not state a separate and independent claim," but rather "stand as additional examples of acts which Complainant alleges created a hostile work environment." Ex. 24 to Haigler Decl. [Dkt. # 82-10] at 79.

*Bridgeforth v. Jewell*, 721 F.3d 661, 664 n.* (D.C. Cir. 2013) (explaining that "retaliation 'encompass[es] a broader sweep of actions' than wrongful discrimination."), quoting *Baloch*, 550 F.3d at 1198 n.4.

But the concept is not unlimited, and actionable retaliation still does not include trivial harms:  "[a]ctionable retaliation claims are limited to those where an employer causes 'material adversity,'" and the plaintiff still must suffer some objectively tangible harm.  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007), quoting *Burlington N.*, 548 U.S. at 68; *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006), quoting *Forkkio*, 306 F.3d at 1130–31.  The Supreme Court has defined material adversity in the retaliation context as an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68, quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).  It is an objective standard that is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances."  *Id.* at 69.

### 1.   Monitoring of plaintiff's computer

Plaintiff asserts that the agency retaliated against her by monitoring her work computer and retrieving documents from her work computer during the EEO investigation.  Pl.'s Opp. at 36.  She argues that "there are few things more chilling to the EEO process than for employees to believe that if they file a discrimination complaint, the contents of their government-owned computer will be searched."  *Id.* at 6.

While there may be some force to that statement in a vacuum, in this case, the agency warned all users when they logged on to their work computers:

> This is a Federal computer system and is the property of the United States Government.  Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to authorized officials at the Federal Energy Regulatory Commission (FERC), Department of Energy (DOE), law enforcement

> personnel, as well as authorized officials of other agencies, both domestic
> and foreign.  Unauthorized or improper use of this system may result in
> administrative disciplinary action and civil and criminal penalties.  Log off
> immediately if you do not agree to the conditions stated in this warning.

Ex. 36 to Haigler Decl. [Dkt. # 82-10].  So, users of FERC's computer system were on notice that

FERC could monitor their internet activity and computer usage.  Since plaintiff had no right to

privacy in her work computer in the first place, plaintiff cannot tie the policy to an effort to chill

her EEO complaints.

Further, plaintiff cannot show material adversity, or objectively tangible harm, stemming

from FERC's alleged actions to access her work computer to collect any information relevant to

her EEO complaint.  "[N]o reasonable worker" would be dissuaded from filing a complaint of

discrimination under these circumstances, because a reasonable worker knows – from the warning

presented every morning – that the agency has full access to the contents of its employees'

computers.  *See Burlington N.*, 548 U.S. at 68.  Both for that reason, and because plaintiff has not

alleged – let alone proven – any tangible harms stemming from FERC's gathering of evidence

from her computer, she cannot show that defendant's actions to monitor her computer to prepare

for litigation was a materially adverse employment action.

> **2.    Failing to credit plaintiff for hours worked for the accrual of religious
> compensatory time**

Plaintiff next contends that the refusal to permit her use overtime she had worked in

advance of the Jewish holiday to offset her religious leave was retaliatory.  Pl.'s Opp. at 34.  The

Court has already found that those actions were not discriminatory.  *See, e.g.*, *Floyd v. Lee*, 968 F.

Supp. 2d 308, 334 (D.D.C. 2013) (dismissing the plaintiff's retaliation claim under Rule 12(b)(6)

for failure to allege any materially adverse employment action and noting that "if the denial of a

request for an accommodation could itself support a claim of retaliation based on the request, then

every failure-to-accommodate claim would be doubled.").

Moreover, because plaintiff again cannot show either material adversity or tangible harm stemming from FERC's denial, she cannot succeed on her retaliation claim.  *See Burlington N.*, 548 U.S. at 57.  Given the complete absence of tangible injury over and above any "[p]urely speculative injuries," the Court is unable to find that plaintiff suffered an adverse employment action for purposes of her retaliation claim.  *See Forkkio*, 306 F.3d at 1130.

### 3.    Denial of requests for reassignment

Plaintiff next complains that the agency denied her request for a reassignment.  Pl.'s Opp. at 32–34.  "[G]enerally lateral transfers, or the denial of them, could not be considered adverse employment actions," except where a lateral transfer is not "truly lateral" because it involves greater benefits or responsibilities.  *Stewart*, 352 F.3d at 427, citing *Brown*, 199 F.3d at 457.  But, a denial of transfer – even if lateral – might constitute an adverse employment action if it "affect[s] the terms, conditions, or privileges of employment or future employment."  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010), quoting *Stewart*, 253 F.3d at 426.

Plaintiff initially requested *not* to be transferred out of Energy Projects, and then possibly changed her mind, and asked to be reassigned to an unspecified office.  *See* Ex. 9 to Haigler Decl. (plaintiff's June 21, 2003 email stating:  "I do not want to be reassigned from Energy Projects."); Ex. 10 to Haigler Decl. (plaintiff's June 25, 2003 email indicating:  "It no longer appears viable that I remain in Energy Projects.").  While management viewed plaintiff's June 25, 2003 email as a request to be reassigned, *see* Ex. 10 to Haigler Decl. (email from manager stating that "this email looks like a request to be reassigned," and denying that request), plaintiff has put forth no evidence to show that her vague request for a transfer would have led to a job with greater responsibility or

benefits.  *See Stewart*, 352 F.3d at 427, citing *Brown*, 199 F.3d at 457.  So, defendant's denial of plaintiff's request for reassignment was not a materially adverse employment action.[18]

### 4.   "Fully Successful" performance evaluations

Plaintiff also contends that she was retaliated against when FERC gave her a "Fully Successful" performance evaluation in 2003 and 2004.  Pl.'s Opp. at 30–32.  In this Circuit, a "thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions." *Brown*, 199 F.3d at 458.  Rather, because "job-related constructive criticism . . . 'can prompt an employee to improve her performance' . . . performance reviews typically constitute adverse actions only when attached to financial harms." *Baloch*, 550 F.3d at 1199; *see also Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("'[F]ormal criticism or poor performance evaluation are [not] necessarily adverse actions' and they should not be considered such if they did not 'affect[] the [employee's] grade or salary.'"), quoting *Brown*, 199 F.3d at 457–58.

Plaintiff has not presented any evidence to show that any of the challenged performance reviews affected her grade or salary.  She posits in her opposition that, as a result of the lower performance reviews, she was in effect excluded from receiving certain cash awards.  Pl.'s Opp. at 31–32.  But, as plaintiff herself concedes, those cash awards would have been discretionary, *id.*, no matter which rating she received, so plaintiff has failed to show a connection between her protected activity and any failure to receive the awards.

---

18      Plaintiff also makes reference to an application that she submitted to the FERC Office of the General Counsel's Solicitor's Office. Ex. 40 to Pl.'s Opp. [Dkt. # 94-5] at 15–18.  The agency ultimately withdrew the posted position, and plaintiff's application was rejected for that reason. Ex. 41 to Pl.'s Opp. [Dkt. # 94–5] at 19.  Because plaintiff has not shown that this transfer would have come with greater benefits or responsibilities, the withdrawal of this job posting is also not a materially adverse action. *See, e.g.*, *Morgan v. Fed. Home Loan Mortg. Co.*, 172 F. Supp. 2d 98, 112–113 (D.D.C. 2001) (finding no adverse employment action if the position to which plaintiff applied was never filled), citing *Macellaro v. Goldman*, 643 F.2d 813, 816 (D.C. Cir. 1980).

It is true that in *Weber v. Battista*, 494 F.3d 179 (D.C. Cir. 2007), the D.C. Circuit overturned a grant of summary judgment to the agency when the plaintiff claimed that she received lower performance awards as a result of an alleged retaliatory performance evaluation.  *Id.* at 185.  In that case, the plaintiff demonstrated that she had received an "optional" cash award in the three years preceding her EEO activity, but, in the very year she engaged in EEO activity, the cash awards ceased.  *Id.*  The Court explained that because of the "causal relationship" between the EEO activity and the lack of a cash award, a reasonable jury could conclude that the denial of the cash award was retaliatory and a triable question of fact had been presented.  Id. at 185–86.

But the Court of Appeals distinguished *Weber* in *Bridgeforth v. Jewell*, 712 F.3d at 664–65, and noted that because Bridgeforth "failed to produce any evidence that would establish a direct and non-speculative connection between action, nomination, and award," he had not proven an adverse action.  *Bridgeforth*, 712 F.3d at 664–65.  The instant case is more like *Bridgeforth* than *Weber* because plaintiff has also failed to come forward with any evidence that would establish a direct connection between her protected activity and the purely speculative denial of a cash award.

Plaintiff also notes that performance appraisals might impact other personnel actions, such as retention during a Reduction in Force.  Pl.'s Opp. at 32.  But there was no Reduction in Force, and so plaintiff's allegation of harm is "unduly speculative."  *See Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009).

And even if plaintiff could show that the challenged performance reviews had adverse consequences, she cannot rebut defendant's legitimate non-discriminatory reason for the reviews – that she in fact performed at a "Fully Successful" level.  *See* Def.'s Mem. at 39.  Despite

her overwrought briefing on almost every other issue, plaintiff does not contest that she performed at a "Fully Successful" level.

For those reasons, the Court will grant summary judgment to defendant on Count IV.[19]

**V.      Plaintiff's hostile work environment claim fails as a matter of law.**

In Count V, plaintiff asserts that she was subjected to a hostile work environment due to her protected activity, and she alleges that the following acts constitute the hostile work environment:

> [R]evocation of accommodations, change in duty hours, monitoring (including of her work station and computer generated documents), her Mid-Cycle Review, her performance evaluations, the designation of her supervisors, denial of leave, denial of credit for work performed and hours worked, denial of her requests and application for reassignment, and other harassing and targeted acts.

Am. Compl. ¶ 36.  Plaintiff's brief adds to those allegations, and explains:

> After she applied for a posted position the posting was withdrawn.  She was not told of the need to evacuate the offices, and she was not provided with assistance to evacuate in an emergency[.]  She was mocked, ridicule[d], marginalized, subjected to acts of harassment (including acts known to managers, including have a sign on her door repetitively torn off, having her office mail box turned upside down, and having a letter attacking plaintiff circulated to senior management), she was told to remove a sign for accommodation that was on her office door.

Pl.'s Opp. at 43–44.

To make out a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult'" and that this behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment

---

19      Even if the Court considered the unexhausted retaliation claims, the merits of those allegations are resolved in other counts of plaintiff's complaint, and they fail to state an adverse employment action in any event.  The revocation of accommodations and changing of plaintiff's hours of work have been resolved in Count I.  The sign on plaintiff's door, the failure to grant administrative leave, and the issues related to the agency's internal investigation will be assessed as part of plaintiff's hostile work environment claim in Count V.

and create an abusive working environment." *Forklift Sys.*, 510 U.S. at 21, quoting *Meritor*, 477 U.S. at 65, 67.  Examining such a claim requires both a subjective and an objective inquiry:  no violation is present "if the victim does not subjectively perceive the environment to be abusive" or if the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.* at 21–22.

"To determine whether a hostile work environment exists, [courts] look to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan*, 536 U.S. at 116, quoting *Forklift Sys.*, 510 U.S. at 23; *see also Baloch*, 550 F.3d at 1201.  "Severity and pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). The Supreme Court has made clear that the conduct must be so extreme "to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.  This "ensure[s] that Title VII does not become a general civility code" that would involve the courts in policing "the ordinary tribulations of the workplace." *Id.*

Much of plaintiff's hostile work environment claim is based on the same allegations that form the basis for her substantive discrimination complaints.  So, except for the "designation of her supervisors," *see* Am. Compl. ¶ 36, many of the allegations in plaintiff's complaint are resolved above, either in a substantive count of discrimination or in the retaliation count.  A plaintiff may not "'bootstrap' the same series of incidents alleged as retaliation 'into a broader hostile work environment claim.'" *Edwards v. EPA*, 456 F. Supp. 2d 72, 96 (D.D.C. 2006), citing *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005).  Plaintiff also suggests in her brief that she was not

"told of the need to evacuate the offices," and that the agency failed to provide her with assistance to evacuate in the event of an emergency; and that she was "mocked, ridicule[d], marginalized" and harassed when a sign on her door was torn off, her office mail box was turned upside down, and an unidentified person circulated a letter attacking her to senior management.  Pl.'s Opp. at 43–44.

But, when considered together, along with any additional incidents that plaintiff mentions, plaintiff's allegations do not rise to the level of severe and pervasive discrimination.  Nothing is overtly discriminatory at all, none of it was physically threatening or extreme, and the isolated annoyances are not pervasive either.  So plaintiff has not come forward with sufficient evidence to establish a hostile work environment claim.

## CONCLUSION

Because plaintiff was not discriminated against, retaliated against, or forced to work in a hostile environment as a matter of law, the Court will grant defendant's motion for summary judgment and dismiss this case with prejudice.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 29, 2016